William J. POLITTE, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Nos. 87–2325, 87–2332.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1988.

Decided July 12, 1988.

Rehearing and Rehearing En Banc Denied Aug. 5, 1988.

Alex R. Tandy, Grand Prairie, Tex., for plaintiff-appellant.

Clifford J. Proud, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

William Politte was named in two indictments. In the first, he was charged with blowing up a building and in the second, he and his wife were charged with fraud. Politte entered into a plea agreement, pleading guilty to several of the offenses. In return, the government promised to recommend a lenient sentence for his wife. After he received a thirteen-year sentence, William Politte filed a motion to vacate, set aside or correct his sentence, in accordance

with Title 28 U.S.C. § 2255, alleging that his plea was not voluntary because it was procured by judicial and familial coercion. The district court summarily denied that motion and Politte appeals. Politte maintains that the district court's denial of his § 2255 motion was clearly erroneous, and that it improperly ruled without conducting a hearing. We find that William Politte's guilty plea was voluntary, and affirm the district court's denial of the post-conviction appeal.

## I. BACKGROUND

William Politte was indicted in August of 1984 for several crimes,[1] including destroying a union hall by the use of explosives. A second and separate indictment[2] was issued in December of 1984, charging both Politte and his wife, Pamela, with conspiring to defraud an insurance company by falsely reporting the theft of their 1983 Lincoln Continental automobile.

Politte filed a number of pre-trial motions. One motion sought to disqualify United States District Judge William Beatty because he granted an early prison release for Jesse Stoneking, an FBI informant who later gathered evidence on Politte. Another motion sought to suppress the evidence Stoneking obtained. Judge Beatty disqualified himself by granting Politte's motion for recusal. The case was reassigned to Chief Judge James L. Foreman who subsequently denied the remainder of Politte's pre-trial motions.

Thereafter, Politte, represented by two attorneys, entered into a detailed and extensive plea agreement. This agreement clearly stated that:

> DEFENDANT is aware ... that he will not be allowed to withdraw his pleas of guilty once they are entered.

The agreement further stipulated that it was "contingent upon co-defendant Pamela Politte's entry of a guilty plea to Indictment II under a separate plea agreement...."

On January 14, 1985, Judge Foreman conducted a hearing in which he questioned Politte about his understanding of the charges against him and his competence to enter into the plea agreement. Complying with Fed.R.Crim.P. 11, the court engaged Politte in the following colloquy:

> THE COURT: All right, sir. We have gone over the plea agreement. We have gone over the possible punishment and I'll ask you once again if you have any questions about it?
>
> DEFENDANT POLITTE: None whatsoever.
>
> THE COURT: Have there been other promises or representations of any kind made to you to induce you or to get you to change your pleas here this morning?
>
> DEFENDANT POLITTE: No, Sir.

(Tr. Change of Plea, p. 25). Following this exchange, the court accepted Politte's guilty plea as one voluntarily made.

A month later, at the February 14, 1985 sentencing, one of Politte's attorneys first indicated that Politte felt some pressure to make a deal with the government. In explaining why Politte entered into the plea agreement, Politte's attorney told Judge Foreman:

> MR. GITCHOFF: [Attorney for Politte] Because he was dead in the water [on the theft of the automobile and mail fraud charges] and because his wife was also a co-defendant in that particular charge, negotiations were made primarily for the benefit of the wife.
>
> ....
>
> I would state to the Court ... that ... the duress that was placed upon Mr. Politte was a serious consideration in or-

---

1. Cause No. 84–30041–01: Counts I and II charged Politte with violating Title 18 U.S.C. § 844(i) and Title 26 U.S.C. §§ 5861 and 5871. Counts III and IV charged Politte (and a co-defendant other than his wife) with violating Title 26 U.S.C. § 5845 (possessing and transferring a firearm). (This indictment was originally numbered 84–50017 when filed on August 31, 1984, but was subsequently changed to 84–30041–01).

2. Cause No. 85–30001–01: Counts I through VII charged William and Pamela Politte with violating Title 18 U.S.C. §§ 1341–1342 (mail fraud). Count VIII charged both with a conspiracy to commit mail fraud in violation of Title 18 U.S.C. § 371. (Cause numbers 84–30041–01 and 85–30001–01 were consolidated for the purpose of entering into a plea agreement).

der to facilitate the guaranteed or the recommended probation for his wife and that we reluctantly went along with this plea with regard to the explosive indictments.

THE COURT: Well, . . .

MR. GITCHOFF: But we pled guilty, Your Honor.

(Disposition Hearing, p. 11, February 14, 1985).

At the conclusion of the sentencing proceeding, Judge Foreman sentenced William Politte to an aggregated term of imprisonment totalling thirteen years. Later, Pamela Politte received a five-year suspended sentence.

William Politte did not take a direct appeal from the convictions based on his plea of guilty. Under Fed.R.Crim.P. 35(b), he filed a motion for reduction or modification of sentence, requesting leniency from what he contended was excessive punishment for the acts charged. The court denied relief and Politte did not appeal the denial of the Rule 35(b) motion. Instead, he filed a § 2255 motion to vacate, set aside or correct the sentence.

Politte contends in his § 2255 motion that he suffered "extreme emotional and psychological stress" and therefore did not voluntarily plead guilty. He alleges that he was told by the government that the only way he could assure himself that his wife would not go to prison would be to accept the government's offer. Without requiring the government to respond, Judge Foreman denied Politte's request for a hearing and then summarily denied the § 2255 motion.[3]

Politte appeals that denial, adhering to his assertion that his plea was involuntary.

His argument is premised on his contention that Judge Beatty's role in releasing Stoneking constituted judicial coercion and that Pamela's impending sentencing resulted in familial coercion. He also claims that he should have received a hearing on his § 2255 motion. We will address each claim in turn.

## II. JUDICIAL COERCION

Politte claims that Judge Beatty's involvement in Stoneking's release from prison amounted to judicial coercion.[4] Specifically, Politte charges that Judge Beatty conducted a "sham" hearing pursuant to Fed.R.Crim.P. 35(b) and released Stoneking after the expiration of the 120–day jurisdictional limit imposed by the rule. Politte accuses Judge Beatty of lacking the authority to release Stoneking and of violating the Separation of Powers Doctrine by making an illegal contract with Stoneking. To substantiate his claim, Politte points to an *ex parte* communication in the judge's chambers between Judge Beatty and Stoneking (and two FBI agents). Politte characterizes this meeting as a negotiation for Stoneking's release.

Jurisdiction over Rule 35(b) motions is placed with the district court. It is fundamentally clear that a district judge is vested with discretion as to whether or not to grant a Rule 35(b) motion. *Williams v. United States*, 805 F.2d 1301 (7th Cir.1986). Judge Beatty had the authority to release Stoneking from federal custody in exchange for his cooperation with the FBI in infiltrating and soliciting incriminating statements from Politte and other individuals under FBI investigation.[5] But Politte

---

3. Rule 4(b), Rules Governing § 2255 Proceedings, 28 U.S.C. § 2255, provides, in part:

   If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified. Otherwise, the judge shall order the United States Attorney to file an answer or other pleading within the period of time fixed by the court or to take such other action as the judge deems appropriate.

4. On appeal, Politte characterized the government's entire case "[as] predicated upon the deliberate and intentional use of lies and other unlawful acts committed in connection with their undercover investigation of appellant which was made possible and judicially aided by a district court judge's unlawful release of the government's undercover informant from prison."

5. This court has previously stated: "Stoneking's mission was a general one: he was to obtain information about criminal matters around St. Louis and southern Illinois. He was paid

specifically charges that Judge Beatty released Stoneking long after the "jurisdictional" 120–day time limitation imposed by Rule 35 had expired.[6]

■ Rule 35 motions are properly directed to the sentencing judge. *United States v. Hammer*, 496 F.2d 917 (5th Cir.1974). *Cf.* Rule 4(b), Rules Governing § 2255 Proceedings, 28 U.S.C. § 2255. Therefore, Stoneking's Rule 35(b) motion was presented to Judge Beatty as the only judicial officer who could have reduced Stoneking's sentence in order to free him to do undercover work for the FBI. Under the law as it existed at the time Judge Beatty authorized Stoneking's release, it appeared that a district judge was afforded a "reasonable period" after a timely filed Rule 35(b) motion to grant a reduction in sentence. *See e.g. United States v. Krohn*, 700 F.2d 1033 (5th Cir.1983). Judge Beatty's order releasing Stoneking preceded this court's decisions in *Gaertner v. United States*, 763 F.2d 787 (7th Cir.1985) and *United States v. Kimberlin*, 776 F.2d 1344 (7th Cir.1985). In *Gaertner*, we did, in fact, hold that 120 days after a Rule 35(b) motion is filed, the district court loses jurisdiction to reduce or modify the conditions of a defendant's sentence. Also, following *Gaertner*, in *Kimberlin*, we held that the jurisdictional effect of the 120–day time limit was to be retroactively applied. *Id.* at 1346.

■ However, acting in the absence of jurisdiction does not equate with acting illegally. Moreover, the issue of the district court's jurisdiction in Stoneking's Rule 35(b) motion is not a matter subject to collateral litigation. We take those judicial facts as they exist in Stoneking's Rule 35 proceedings. Judge Beatty was vested with general statutory authority to determine any Rule 35(b) motions submitted to him. He acted lawfully but with an apparent lack of jurisdiction. But we do not decide the jurisdiction issue.

■ As the district court correctly found, Politte lacked standing to challenge the release of another convicted felon. Politte counters by stating that his standing "is derived from his rights to not have illegally obtained evidence introduced against him at trial." This creative stretch of the "fruit of the poisonous tree" doctrine is so tenuous as to be nonexistent. The statutorily authorized judicial act which resulted in Stoneking's release bears no relationship to any rights of Politte. After releasing Stoneking under Rule 35(b), Judge Beatty had no connection with or responsibility for Stoneking's conduct as an FBI informant.[7] Regardless of the basis for Stoneking's Rule 35(b) release, it was not done illegally, Politte's constitutional rights were not implicated, and he has no standing to contest that release. *See Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978); *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *United States ex rel. Cunningham v. DeRobertis*, 719 F.2d 892 (7th Cir.1983).

It is significant that Judge Beatty removed himself from Politte's case to avoid even an appearance of prejudice against Politte which might be inferred from Stoneking's early release. Moreover, the record in this case does not disclose any conduct on behalf of Judge Beatty which could have been viewed as actual prejudice against Politte. It was Stoneking who requested that no attorneys be present at his meeting with Judge Beatty—because he feared for his safety and "wanted to live." The *ex parte* communication with Stoneking, while clearly a mistake,[8] does not af-

---

$2,700 a month for tape recording conversations he had with his former associates and ... people he met during his almost twenty months of undercover work." *United States v. Allen*, 798 F.2d 985, 990 (7th Cir.1986).

**6.** Stoneking's Rule 35 motion was filed on March 12, 1982. Judge Beatty held a hearing on the motion on July 21, 1982.

**7.** In fact, the terms of Stoneking's probation contained no requirement that he testify against Politte or any other defendant.

**8.** On another occasion Stoneking, who was in prison, went so far as to telephone Judge Beatty's home collect—a call which Judge Beatty unfortunately accepted. Apparently because of Stoneking's fear of retaliation, Judge Beatty twice engaged in *ex parte* communication *relating to Stoneking's Rule 35 petition*. Such direct

ford any refuge for Politte. We agree with Judge Foreman's finding that there was "no way that [Judge Beatty's] actions manifested 'coercion' of any kind in *this* case." (emphasis in original).

## III. THIRD–PARTY COERCION

Politte also alleges that his sentence should be vacated because the government "directly threatened to impose a heavier sentence" on his wife if he did not waive his right to a jury trial and enter a guilty plea. The government denies making such a threat. As indicated earlier, Pamela, Politte's wife, was charged along with him in the second indictment. He does not dispute that the government had sufficient cause to prosecute Pamela, but says that she was merely an accessory to the acts charged in the second indictment, and a first offender at that. Politte asserts that his free will was undermined by the government's improper and "blatant threat" against his wife, and that this amounted to coercion which ultimately rendered his plea involuntary.[9]

■ Concern regarding the outcome of criminal charges against one's spouse does not, perforce, result in coercion. As in the case at bar, in *United States v. Usher*, 703 F.2d 956 (6th Cir.1983), the defendant's wife was charged with the same offenses in a separate indictment. Defendant Usher claimed that his wife would only be allowed to bargain for a suspended sentence if he entered a guilty plea to the crimes charged in the indictment. The court considered the totality of the circumstances and found that his guilty plea was voluntary and a product of "calculated bargaining." *Usher*, 703 F.2d at 958. The court determined that the guilty plea was not inherently coercive merely because the government linked the defendant's plea with an agreement of leniency for his wife. *See also Harman v. Mohn*, 683 F.2d 834 (4th Cir. 1982) (no inherent problem with including third-party beneficiaries in plea negotiations); *United States v. Tursi*, 576 F.2d 396 (1st Cir.1978) (upholds plea agreement based on government's promise of leniency for defendant's son).[10]

The government has the duty of prosecuting all defendants in good faith—including those described as third parties. When a grand jury indictment has been returned against any defendant, there is a strong presumption that the charge is brought in good faith. A defendant bears a heavy burden when seeking to show that a grand jury indictment brought against a third party was pursued by the government in bad faith.

Here, a grand jury found probable cause and returned an indictment against Pame-

---

contact with Stoneking was improper. *See* Canon 3A(4), *Code of Judicial Conduct for United States Judges*. There is virtually no occasion where a federal judge should permit litigants to have *ex parte* contact regarding a pending case. There may be a rare instance where such contacts are requested by all parties concerned— but even then the propriety of such contact is questionable. The *ex parte* contact permitted by Judge Beatty, while made with good intentions, created a situation which unnecessarily called into question the impartiality of the federal courts and caused Judge Beatty to recuse himself.

9. Politte refers to this as "familial coercion." Generally the phrase "familial coercion" refers to pressures placed on a defendant by members of his family, inducing him to plead guilty. *Wojtowicz v. United States*, 550 F.2d 786, 792 (2nd Cir.1977), and *United States v. Bartoli*, 572 F.2d 188, 189 (8th Cir.1978). Politte uses "familial coercion" in his § 2255 motion as "coercion in the form of a threat of prison sentences

for his wife. . . ." It appears that Politte is using the term in a different context, referring to pressures placed *on* a family member rather than *by* a family member. We view this as an allegation of coercion relating to a third party and decline to adopt Politte's interpretation of the term "familial coercion."

10. Politte relies on *United States v. Cammisano*, 599 F.2d 851 (8th Cir.1979). In that case, the defendant claimed that the government threatened his brother with a long jail sentence if he did not plead guilty. The court of appeals remanded the case, but not merely because of *defendant's concern* about his brother's future. The district court in *Cammisano*, unlike the district court here, left a record in its Rule 11 hearing which fell short in both "spirit and letter" of the rule's purpose—namely a determination that the plea was voluntary and not a by-product of threats, promises, duress or coercion. For this reason, *Cammisano* is dissimilar to Politte's appeal and defendant's reliance on that case is misplaced.

la. There is no dispute that the government acted in good faith in pursuing the indictment against her.[11] There is also no dispute that Politte entered into a plea agreement which provided that his wife would receive a suspended sentence as a consideration for Politte's guilty plea.

■ We hold that a good faith prosecution of a third party, coupled with a plea agreement which provides for a recommendation of a lenient sentence for that third party, cannot form the basis of a claim of coercion by a defendant seeking to show that a plea was involuntarily made. *See Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir.1988).[12] However, when assessing voluntariness, district judges must be alert to the inherent problem of coercion when third party guilty pleas are involved.[13] *Bontkowski*, at 316 (Cudahy, J., concurring in part and dissenting in part).

■ It is likely that William Politte's personal motives for pleading guilty were influenced by his sense of concern for his wife. The worry about his wife's fate may have increased the anxiety that he felt anticipating sentencing—however, that does not equate with duress in the constitutionally impermissible sense nor does it render his subsequent plea involuntary. *See United States v. Diaz*, 733 F.2d 371, 375 (5th Cir.1984). (Defendant's plea not involuntary merely because of desire to extricate relative from good faith prosecution.)

Furthermore, it is obvious that any sentence to be given Pamela would be the result of judicial action taken in accordance with the governing statute. Politte does not contend that he was confused or misled about the potential sentence his wife could receive absent the benefit of a plea agreement. Nor does he assert a belief that, in the absence of a plea agreement, the government, rather than the court, would determine the nature of his wife's sentence. The district court correctly determined that:

> [while the] 'arm twisting' by the government clearly had an effect on both the Polittes' decisions to plead guilty, [the court] does *not* find it constitutionally impermissible. As the Supreme Court stated in *Bordenkircher, supra:*
>
> > 'While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, *the imposition of these difficult choices [is] an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'* 434 U.S. at 364, 98 S.Ct. at 668 (*quoting Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (emphasis added)).

The court in this case properly relied on the facts which were not in dispute *and* Politte's comments in the Rule 11 colloquy.

In fact, Politte unequivocally told the district court that he was not induced into making the bargain when the court gave him an opportunity to recant his plea. As a further indication of his willingness to negotiate, we note that it was Politte, not

---

**11.** Moreover, the government asserts that it had strong evidentiary proof against Pamela on the mail fraud scheme, perhaps even stronger evidence than against William.

**12.** The Supreme Court has expressly reserved judgment on the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for a third party. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n. 8, 98 S.Ct. 663, 668 n. 8, 54 L.Ed.2d 604 (1978); *United States v. Usher*, 703 F.2d 956, 958 (6th Cir.1983).

**13.** We concur with several other courts of appeals "that guilty pleas made in consideration of lenient treatment as against third persons pose a greater danger of coercion than purely bilateral plea bargaining, and that, accordingly, 'special care must be taken to ascertain the voluntariness of' guilty pleas entered in such circumstances." *United States v. Tursi*, 576 F.2d 396, 398 (1st Cir.1978). *See United States v. Usher*, 703 F.2d 956 (6th Cir.1983); *Martin v. Kemp*, 760 F.2d 1244, 1247 (11th Cir.1985); *United States v. Bambulas*, 571 F.2d 525, 526–27 (10th Cir.1978); *Johnson v. Wilson*, 371 F.2d 911 (9th Cir.1967). "As a threshold matter, we see no intrinsic constitutional infirmity in broadening plea negotiations so as to permit third party beneficiaries." *United States v. Nuckols*, 606 F.2d 566, 569 (5th Cir.1979); *Harman v. Mohn*, 683 F.2d 834, 837 (4th Cir.1982).

the government, who initiated the plea agreement.

The district court considered the totality of the circumstances in accepting the plea as one freely given—including statements made under oath by Politte himself. As this court held in *United States v. Darling*, 766 F.2d 1095, 1101 (7th Cir.1985), a "defendant's declaration in open court that his plea is not the product of threats or coercion carries a strong presumption of veracity." In *United States v. Ellison*, 835 F.2d 687 (7th Cir.1987), we ruled that "[t]he whole point of the plea proceeding (the Rule 11 colloquy) is to establish that the plea was knowingly and voluntarily made." We further held that "[r]ational conduct requires that voluntary responses made by a defendant under oath before an examining judge be binding." *See Bontkowski*, at 314. These arguments are no less strong in Politte's case.

■ As in *Usher*, Politte struck a "calculated bargain" which the government had every right to accept. Like the court in *Usher*, Judge Foreman considered the totality of the circumstances in making his determination that Politte's plea was voluntary. The trial court did not abuse its discretion in enforcing the plea agreement.

## IV. HEARING

Finally, Politte argues that Judge Foreman misunderstood the degree of coercion inflicted upon him and should have held a § 2255 hearing in order to more fully explore the allegations surrounding Judge Beatty's ruling which authorized Stoneking's early release. In *United States v. Robinson*, 585 F.2d 274, 280 (7th Cir.1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979), this court held that "[w]here a record conclusively demonstrates that defendant is entitled to no relief on his § 2255 petition to vacate sentence, a full evidentiary hearing is not required."

Merely raising a § 2255 motion does not automatically entitle a defendant to a hearing. "To allow indiscriminate hearings in federal post-conviction proceedings, whether for federal prisoners under 28 U.S.C. § 2255 or state prisoners under 28 U.S.C. §§ 2241–54, would eliminate the chief virtues of the plea system—speed, economy, and finality." *Blackledge v. Allison*, 431 U.S. 63, 71, 97 S.Ct. 1621, 1628, 52 L.Ed.2d 136 (1977). As we held in *Key v. United States*, 806 F.2d 133, 137 (7th Cir.1986) "where the record, ... reflects that the defendant voluntarily entered into the plea and as here, the § 2255 motion does not clearly present new specific allegations, then no § 2255 evidentiary hearing is required."

■ There is no reasonable basis afforded by this record which would entitle Politte to a full evidentiary hearing. His claim with regard to Judge Beatty's release of Stoneking is beyond the pale. The facts with regard to Politte's claim concerning coercion relating to his wife are undisputed. The district court was not required to unnecessarily expend the resources of the court and conduct an evidentiary hearing.

## V. CONCLUSION

Politte lacked standing to challenge Judge Beatty's release of Stoneking under Rule 35(b). The plea negotiations which involved both the potential sentences for Politte and his wife were permissible and entered into voluntarily. Politte was not deceived, coerced or tricked into pleading guilty; he did so at his own initiative and as a matter of his own free will. There was no judicial coercion upon Politte, nor was the factor of his wife's potential sentencing impermissibly coercive. The nature and facts of this § 2255 petition did not require an evidentiary hearing. For these reasons, the decision of the district court is AFFIRMED.