**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF
AMERICA,
  *Plaintiff-Appellee*,

v.

SENG CHEN YONG,
  *Defendant-Appellant.*

No. 17-16017

D.C. Nos.
2:15-cv-02476-APG
2:14-cr-00249-APG-PAL-3

OPINION

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted September 6, 2018
San Francisco, California

Filed June 7, 2019

Before: Marsha S. Berzon and Michelle T. Friedland,
Circuit Judges, and Kathleen Cardone,\* District Judge.

Opinion by Judge Cardone

---

\* The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

## SUMMARY[**]

### 28 U.S.C. § 2255

The panel affirmed the district court's denial of Seng Chen Yong's 28 U.S.C. § 2255 motion to vacate his guilty plea and set aside his misdemeanor conviction related to operating an unlawful sports betting operation.

Yong argued that his guilty plea was involuntary because it was improperly conditioned on leniency for his son and was tainted by government misconduct.

The panel held that a guilty plea made in exchange for leniency to a third party is involuntarily made if the government lacked probable cause to prosecute the third party at the time of the guilty plea. Considering the totality of the circumstances, the panel held that the Government had probable cause to prosecute Yong's son at the time of Yong's plea.

Rejecting Yong's contention that the Government's pervasive misconduct required reversal, the panel did not believe that the misconduct tainted his plea or otherwise improperly induced it, where Yong was aware of the misconduct and decided to plead guilty nevertheless.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Thomas C. Goldstein (argued) and Tejinder Singh, Goldstein & Russell P.C., Bethesda, Maryland, for Defendant-Appellant.

Elizabeth O. White (argued), Appellate Chief; Adam Flake, Assistant United States Attorney; Steven W. Myhre, Acting United States Attorney; United States Attorney's Office, Las Vegas, Nevada; for Plaintiff-Appellee.

**OPINION**

CARDONE, District Judge:

Defendant-Appellant Seng Chen Yong ("Yong") appeals the denial of his 28 U.S.C. § 2255 motion to vacate his guilty plea and set aside his misdemeanor conviction related to operating an unlawful sports betting operation. Yong and a group of associates were originally charged with felonies related to an illegal sports betting operation based in Caesars Palace Hotel & Casino ("Caesars") in Las Vegas during the 2014 World Cup soccer tournament. As part of a group plea deal, Yong and three co-defendants pleaded guilty to the misdemeanor of acting as an accessory after the fact to co-defendant Hui Tang's violations of the Wire Act, 18 U.S.C. § 1084. In exchange for this group plea, the Government dismissed felony charges pending against Yong's son, Wai Kin Yong ("Wai Kin"). On appeal, Yong argues that his guilty plea was involuntary because it was improperly conditioned on leniency for Wai Kin and was tainted by government misconduct.

As to the first issue, we consider, as a matter of first impression, the standard for determining the voluntariness of guilty pleas obtained through offers of leniency for third parties. We hold that a guilty plea made in exchange for leniency to a third party is involuntarily made if the government lacked probable cause to prosecute the third party at the time of the guilty plea. Because the Government had probable cause to prosecute Wai Kin at the time of Yong's plea, we affirm. We likewise affirm on the government misconduct challenge, as Yong was aware of the Government's misconduct at the time of his plea but nonetheless pleaded guilty.

## FACTUAL AND PROCEDURAL HISTORY

In June of 2014, a group of gamblers from Asia traveled to Las Vegas for the 2014 FIFA World Cup soccer tournament kickoff. The group stayed at Caesars in luxury villas ranging in size from 8,000 to 12,000 square feet. Yong, his son Wai Kin, and their guests stayed in Villa 8881. Wei Seng Phua ("Phua"), his son Wai Kit Phua ("Wai Kit"), and their guests stayed in Villa 8882. Hui Tang and his guests stayed in Villa 8888.

During this stay, a Caesars employee entered Villa 8888 to check on the condition of the suite. The employee noticed an array of computers and computer monitors that were not normally present in the room and were arranged in an unusual configuration. The employee reported the presence of the computers to his supervisors. Caesars technical support and security staff discovered that the guests of Villa 8888 had requested the installation of an unusual amount of technical equipment, including eight computers, multiple monitors, three televisions connected to three different cable/satellite television providers, desk telephones, and enhanced Digital Subscriber Line ("DSL") internet access.

The Caesars management was concerned that the arrangement could be used to operate an illegal sports book. Caesars informed the Nevada Gaming Control Board ("NGCB"), which informed the Federal Bureau of Investigation, which opened an investigation. The FBI suspected that the individuals in the three villas were jointly participating in an illegal betting operation but lacked sufficient evidence to pursue a case against anyone except the individuals staying in Villa 8888.

After brainstorming about how to "tighten up the [probable cause]," and with assistance from a contractor responsible for internet services at Caesars, the FBI agents and the assistant United States Attorney assigned to the case devised a plan to search the villas without obtaining a warrant. FBI agents, together with NGCB agents and the cooperating IT contractor, attempted to disrupt the DSL internet service to villas 8882 and 8888, the Phua and Tang villas respectively. They did so in the hope of generating a call for service—and with such a call, the opportunity to enter the villas. No call for service came, but someone in Villa 8882 requested a laptop. Seizing on the opportunity, the contractor and an FBI agent posing as the contractor's employee went to deliver the laptop. When they entered Villa 8882, the contractor and the agent heard what sounded like a sporting event playing in the background, but a butler prevented them from going further into the suite.

Sometime later, the contractor received a service call from Villa 8881 reporting that the internet was not working. Realizing that he had accidentally disrupted the internet service for Villa 8881 instead of Villas 8882 and 8888, the contractor reconnected Villa 8881's internet and then entered Villa 8881 to look around, acting as though he was responding to the service call even though he had already

fixed the disruption. The contractor carried on a fake telephone conversation "to make it look like [he was] there for a legitimate purpose," and recorded the visit on his cell phone. Yong was present in Villa 8881 while the contractor was there, looking at what appeared to the contractor to be a sports website of some kind.

The next day, the contractor tried to disrupt the service to Villa 8882 again and this time succeeded. After Phua told the butler on duty that the internet was not working, the butler put in a call for service. Two agents masquerading as technicians and wearing body cameras responded to the call so they could look for incriminating evidence. When they entered Villa 8882, the agents found Phua sitting at a laptop computer, viewing a sports betting site. On Phua's computer, the agents also saw an open instant messaging window containing the words "good luck on the hedge bet," or something similar. Another person was also viewing a sports-betting website, but he quickly switched to viewing the Google search page when he noticed an agent approaching. Yong was there as well, visiting from Villa 8881, but he was not using a laptop.

The agents, with the help of an assistant United States Attorney, filed a warrant application to search Villas 8881, 8882, and 8888. The warrant application omitted the fact that the agents had only been able to enter the villas by surreptitiously disrupting the DSL. In fact, the agents created multiple documents designed to give the false impression that the internet outages had been fortuitous, rather than orchestrated by the FBI. In addition, the warrant application asserted that the contractor, on his visit to Villa 8881 after the accidental disruption of internet service to that suite, saw Yong monitoring "odds for illegal sports gambling," even though, as the contractor later admitted,

nothing about the website indicated that it was illegal, or even gambling-related at all.

The magistrate judge signed the warrant on July 9, 2014, and it was executed the same day. Yong was present when agents executed the warrant on Villa 8881, the villa where Yong and Wai Kin were staying. The search of that villa revealed gambling ledgers containing names, win/loss records, and percentages paid to various representatives and associates. Agents executing the Villa 8882 warrant found Phua, Phua's son, and Wai Kin, Yong's son, watching while a World Cup soccer match played on the television. All three were sitting in front of laptop computers viewing a sports betting website displaying real-time betting odds for the soccer game. The laptops also displayed instant messaging windows. Wai Kin's laptop, logged into the betting website showed an available balance of $1.6 million U.S. dollars. The agents found ledgers in Villa 8882 similar to those found in Villa 8881.

Five days later, the Government filed a criminal complaint charging eight defendants—including Yong and Wai Kin—with federal felonies, including the operation of an illegal gambling business in violation of 18 U.S.C. § 1955 and violations of the Wire Act, 18 U.S.C. § 1084. The defendants were arrested and subsequently indicted by a federal grand jury.

In the course of pre-trial discovery, the Government produced a tape recording that alerted Yong and the other defendants to the fact that the Government had intentionally disrupted the DSL to gain entry into the villas. On October 27, 2014, Phua, Phua's son, Yong, and Wai Kin filed a motion to suppress the evidence obtained from the hotel rooms, both before and after the execution of the warrant, as well as all fruits thereof. The next day, they also

filed a motion arguing that the Government's misrepresentations and omissions to the magistrate judge tainted the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978), arguing that the fruits of the search warrant must be suppressed on that basis as well. In the motions, the defendants argued that the Government invalidly obtained their consent to enter by intentionally disrupting the DSL in the defendants' villas, concealed that fact from the magistrate judge, and made numerous additional intentional or reckless misstatements in the warrant affidavit.

The Government responded to the motions in November 2014, conceding that it intentionally disrupted the DSL service to the villas but arguing that its actions were nonetheless constitutional. The Government did not, however, fully admit the extent of its actions at that time.

After the briefing on the motions was complete, but before the evidentiary hearing on the motions, Yong and four of his co-defendants negotiated pleas. Yong agreed to plead guilty to the misdemeanor of acting as an accessory after the fact to co-defendant Hui Tang's violations of the Wire Act, as set forth in a superseding criminal information. His plea agreement explained that it was part of a "group plea." It was conditioned upon each of five defendants pleading guilty and upon the court accepting those pleas. The agreement also stated that "[i]n exchange for defendant SENG CHEN YONG and [four other defendants] entering their group pleas, the Government will move to dismiss the charges pending against Wai Kin Yong."

Yong and the Government agreed to recommend a sentence of five years of unsupervised probation and a fine of $100,000. They further agreed that Yong would depart

the country immediately and not return for five years. Yong also agreed to forfeit his interest in certain property.

On December 10, 2014, the district court conducted a hearing to decide whether to accept Yong's plea. The court explained to Yong that the purpose of the hearing was "to make sure that you understand the consequences of a guilty plea," and "to make sure that you are entering into this plea and this agreement with the Government knowingly, voluntarily, and that you are not being forced or coerced into this agreement and into this plea." The court then asked several questions to assess whether Yong's plea was intelligent and voluntary. Near the beginning of the colloquy, the court asked Yong, "[h]ave any threats or promises been made to you to get you to waive your right to an indictment?" to which Yong responded "No." The court also asked the Government to provide its understanding of the plea agreement, whereupon the Government clarified, among other things, that it was a group plea proposal, that Yong was the last defendant to satisfy the group condition, and that the Government would dismiss charges against Wai Kin if the plea were accepted. The court again asked Yong if "anyone threatened [him] in order to get [him] to plead guilty," or if anyone was "forcing [him] in any way to plead guilty," to which his answer was again "No." The court entered a judgment of conviction and sentenced Yong to five years of unsupervised probation. At the end of the hearing and after it had accepted Yong's plea and imposed his sentence, the court was made aware that Wai Kin was Yong's son.

Phua and his son did not plead guilty and pressed on with the motion to suppress. After a four-day evidentiary hearing, the magistrate judge issued two reports recommending that the *Franks* motion be granted because the warrant affidavit

contained material omissions and misrepresentations that, once removed, left the warrant lacking probable cause sufficient to support the search. At the same time, the magistrate judge concluded that the warrantless entry to drop off the laptop did not violate the Phuas' Fourth Amendment rights because the occupants had validly consented to the entry. The magistrate judge also held, however, that the agents' thwarted attempt to enter the interior of the villa exceeded the scope of that consent, so any evidence gathered from that attempted entry should be suppressed. The agents' entry while posing as technicians to repair the DSL disruption was also justified by the Phuas' consent, the magistrate judge opined, even though the agents had misleadingly obtained the consent by intentionally disrupting the DSL as part of their ruse to gain access.

Several months later, the district court rejected the magistrate judge's recommendation in part and granted Phua's motions[1] to suppress the Government's evidence in full. Specifically, the court held that the Government had repeatedly violated the Fourth Amendment by disrupting internet service to the villas in order to gain entry and by submitting a warrant affidavit containing multiple intentional and reckless falsehoods and omissions in violation of *Franks*. Shortly afterward, the court dismissed the charges against Phua.

Yong then moved to vacate his conviction in the district court under 28 U.S.C. § 2255 on three grounds. First, he argued that the Government committed misconduct in its

---

[1] Phua's son pleaded guilty after the magistrate judge recommended that the *Franks* motion be granted but before the district court entered judgement, leaving Phua as the sole defendant litigating the motions to suppress.

investigation and prosecution of the case sufficient to render his plea involuntary.  Second, he argued that it was unlawful to condition dismissal of charges against Wai Kin on Yong's plea because the Government lacked probable cause to prosecute Wai Kin.  The district court denied Yong's motion without a hearing but granted a certificate of appealability as to all three issues raised in the motion.  Yong moved for reconsideration, which the district court denied.

## STANDARD OF REVIEW

We review a district court's denial of a § 2255 motion de novo,  *United States v. Ratigan*, 351 F.3d 957, 961 (9th Cir. 2003) (citing *United States v. Benboe*, 157 F.3d 1181, 1183 (9th Cir. 1998)), while we review for clear error any factual findings the district court made in deciding the motion, *United States v. Christakis*, 238 F.3d 1164, 1168 (9th Cir. 2001).  We review de novo a district court's finding as to whether a plea is knowing and voluntary.  *United States v. Kaczynski*, 239 F.3d 1108, 1114 (9th Cir. 2001) (citing *United States v. Littlejohn*, 224 F.3d 960, 964 (9th Cir. 2000)).

## DISCUSSION

"Due process guarantees under the [F]ifth [A]mendment require that a defendant's guilty plea be voluntary and intelligent." *Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir. 1988) (citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)). Yong argues that his guilty plea was not voluntary for two reasons: (1) the Government impermissibly conditioned leniency for Wai Kin on Yong's guilty plea, and (2) the Government's misconduct was so pervasive as to have coerced Yong's plea.  The Government does not deny using the charges against Wai Kin as a bargaining chip in its plea negotiations with Yong, nor does it deny engaging in

misconduct during the investigation. Nevertheless, the Government maintains that its actions did not render Yong's guilty plea involuntary, because (1) the Government had probable cause to prosecute Wai Kin at the time of Yong's plea and (2) Yong's plea was knowing and voluntary despite the earlier misconduct. Lastly, the Government mounts a procedural attack on the claims in Yong's § 2255 motion to vacate, arguing that he has not shown cause for his failure to raise these issues on direct appeal.

## A

Before considering Yong's challenges to the voluntariness of his plea, we first address the Government's procedural argument on the motion to vacate. *See United States v. Braswell* 501 F.3d 1147, 1149 (9th Cir. 2007) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)).

To challenge a conviction in a § 2255 proceeding based upon a claim of error that could have been raised on direct appeal but was not, a defendant must demonstrate both cause to excuse the procedural default, as well as actual prejudice resulting from that error. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (citing *United States v. Frady*, 456 U.S. 152, 168 (1982)). Yong asserts two bases for cause to excuse this default. First, Yong argues that "he had every reason to expect that if he sought to appeal, the [G]overnment would act vindictively toward his son." According to Yong, this "ongoing threat" of reinstatement of charges against Wai Kin, or Wai Kin's indictment on new charges, effectively negated Yong's ability to challenge the voluntariness of his plea on direct appeal. Second, Yong asserts that because the Government's deceptive tactics falsely inflated the strength of its case, he was not only unduly pressured to plead guilty, but he was also unable to

assess the strength of his case to make reasoned decisions as to his defense.

Because we ultimately conclude that the claims in Yong's § 2255 motion are "clearly not meritorious despite [the] asserted procedural bar," we decline to resolve whether Yong has sufficiently established cause and prejudice to overcome procedural default and proceed to the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002).

**B**

Yong first seeks to set aside his guilty plea as involuntary, arguing that the Government impermissibly conditioned it on leniency for Wai Kin without having the requisite probable cause to prosecute Wai Kin at the time of Yong's plea.

A defendant may challenge a conviction resting on a guilty plea on the ground that it was not "voluntary and intelligent." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). "A plea is voluntary if it 'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Kaczynski*, 239 F.3d at 1114 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). A plea of guilty entered by an individual fully aware of the plea's direct consequences "must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Id.* (quoting *Brady v. United States*, 397 U.S. 742, 755 (1970)). "A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void. A conviction based upon such a plea is open to collateral attack." *Machibroda v. United States*,

368 U.S. 487, 493 (1962). A conclusion that Yong's plea was involuntary would therefore invalidate his plea agreement and require setting aside the conviction that resulted from it. *See id.*

We agree with Yong that with regard to his argument that the Government improperly bargained with leniency for Wai Kin, the validity of Yong's guilty plea hinges on the existence of probable cause to prosecute Wai Kin at the time of his plea. The Government may offer a plea agreement to a defendant where a third party receives a benefit from the defendant's decision to plead guilty. *United States v. Caro*, 997 F.2d 657, 658–59 (9th Cir. 1993). A plea is therefore not necessarily invalid if taken in exchange for leniency for a third party or in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered. *Id.*; *See United States v. Castello*, 724 F.2d 813, 814–15 (9th Cir. 1984). The guilty plea, however, must still be voluntarily made. Fed. R. Crim. P. 11(b)(2); *Boykin*, 395 U.S. at 242–43. To determine the voluntariness of the plea, "we look to the totality of the circumstances, examining both the defendant's 'subjective state of mind' and the 'constitutional acceptability of the external forces inducing the guilty plea.'" *Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007) (quoting *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986)). And, when a plea agreement is made based upon a promise or threat to a third party, "a more careful examination of the voluntariness" is necessary. *Caro*, 997 F.2d at 659 (citing *Castello*, 724 F.2d at 815).

This circuit has yet to provide a standard for determining whether a guilty plea conditioned on leniency for a third party is voluntary. Every federal court of appeal to consider the issue, however, has held that plea agreements that condition leniency for third parties on the defendant's guilty

plea are permissible so long as the Government acted in "good faith," meaning that it had probable cause to prosecute the third party. *See United States v. McElhaney*, 469 F.3d 382, 385 (5th Cir. 2006); *United States v. Vest*, 125 F.3d 676, 680 (8th Cir. 1997); *United States v. Wright*, 43 F.3d 491, 499 (10th Cir. 1994); *United States v. Pollard*, 959 F.2d 1011, 1021–22 (D.C. Cir. 1992); *United States v. Marquez*, 909 F.2d 738, 742 (2d Cir. 1990); *Martin v. Kemp*, 760 F.2d 1244, 1248 (11th Cir. 1985); *Harman v. Mohn*, 683 F.2d 834, 837 (4th Cir. 1982); *United States v. Nuckols*, 606 F.2d 566, 569–70 (5th Cir. 1979); *see also Politte v. United States*, 852 F.2d 924, 929 (7th Cir. 1988) ("We hold that a good faith prosecution of a third party, coupled with a plea agreement which provides for a recommendation of a lenient sentence for that third party, cannot form the basis of a claim of coercion by a defendant seeking to show that a plea was involuntarily made."). As the Fifth Circuit explained in *Nuckols*:

> Recognizing, however, that threats to prosecute third persons can carry leverage wholly unrelated to the validity of the underlying charge, we think that prosecutors who choose to use that technique must observe a high standard of good faith. Indeed, absent probable cause to believe that the third person has committed a crime, offering "concessions" as to him or her constitutes a species of fraud. At a minimum, we think that prosecutors may not induce guilty pleas by means of threats which, if carried out, would warrant ethical censure.

606 F.2d at 569.

We agree with these courts and hold that the Government must have probable cause to prosecute a third party when it conditions leniency for that party in exchange for a defendant's guilty plea. We note that these courts have used wording that focuses on whether probable cause was present at the time the threat was made or lenity offered. *See, e.g.*, *Marquez*, 909 F.2d at 742 ("Where the plea is entered after the prosecutor threatens prosecution of a third party, courts have afforded the defendant an opportunity to show that probable cause for the prosecution was lacking when the threat was made."); *Wright*, 43 F.3d at 499. A prosecutor's improper coercion actually takes effect, though, when a defendant pleads guilty as a result of the threat or offer of lenity. Therefore, a defendant may successfully challenge the voluntariness of his plea by showing that probable cause to prosecute the third party did not exist at the time the defendant pleaded guilty, even if the Government had probable cause to prosecute at an earlier time.[2]

---

[2] Because plea agreements reached in exchange for leniency for a third party "might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider," *Caro*, 997 F.2d at 659 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n.8 (1978)), the Government must also have probable cause to prosecute the defendant being offered the plea in exchange for leniency for a third party, in addition to probable cause to prosecute the third party. In other words, a "high standard of good faith" requires the Government to have probable cause both to prosecute the defendant and to prosecute the third party at the time the defendant enters the plea agreement in exchange for leniency for the third party. *See Nuckols*, 606 F.2d at 569.

Yong has not challenged that the Government lacked probable cause to support the charges against him in this case. Even if he had, there was at least as much evidence against him as against Wai Kin, so, as explained more below, his challenge to the plea on that ground would have also failed.

"Probable cause exists when there is a fair probability or substantial chance of criminal activity." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). The Supreme Court has "often told litigants" that probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). We look for a "fair probability" on which "reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (alteration in original) (quoting *Gates*, 462 U.S. at 231, 238)). We must assess probable cause based upon the "totality of the circumstances" under this "practical and common-sensical standard." *Id.*

Here, in exchange for Yong's guilty plea, the Government offered to drop the charges against Yong's son, Wai Kin. It is well established that, absent fraud on the grand jury or some similar process flaw, a grand jury indictment conclusively demonstrates probable cause *at the time of the indictment*. *See Kaley*, 571 U.S. at 328 (citing *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)). The Government acknowledged at argument, however, that if it later discovers post-indictment, after further investigation, evidence that undermines or contradicts the evidence presented to the grand jury, probable cause may no longer exist. Yong argues that because further investigation after the indictment did not reveal *additional* inculpatory evidence as to Wai Kin, there was no longer probable cause at the time Yong accepted the plea agreement and pleaded guilty. Accordingly, the issue we confront is whether the Government's failure to find further evidence against Wai Kin is equivalent to it discovering evidence that undermines or contradicts the evidence it presented before the grand jury to obtain the indictment.

We conclude that there was always sufficient evidence to support the finding of probable cause for the charges against Wai Kin, and that the failure to find further evidence did not change that. There is no dispute that when the agents entered Villa 8882, they observed Wai Kin sitting before an active laptop computer monitoring live odds of the World Cup match he was viewing on television. Further, he was logged into the laptop using the login name "WaiKin." He was seated near Phua, who it was later discovered had exchanged hundreds of messages regarding a large-scale illegal sports book, and Phua's son Wai Kit. The World Cup tournament was the subject of the gambling operation and Wai Kin, Phua, and Wai Kit were seemingly engaged in parallel activity when the agents entered Villa 8882. Moreover, hand-written ledgers documenting bets were found in both Villas 8881 and 8882. Viewing these uncontested observations through a "practical" and "common-sensical" lens, there was a fair probability that criminal activity was afoot and that Wai Kin was involved. *See Harris*, 568 U.S. at 244.

We are mindful that "[a]s a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (quoting *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005)). It is also true, as Yong argues, that the Supreme Court has found in the context of *Brady* violations that an investigation's failure to turn up incriminating evidence against a defendant can be exculpatory. *See Kyles v. Whitley*, 514 U.S. 419, 423, 429, 450 (1995). For example, in *Kyles*, part of the prosecution's theory was that the killer (when Kyles was charged with being the killer) drove to a parking lot the evening after the murder and left his car there

to hide the vehicle from the police. *Id.* at 450. But the prosecution learned that a computer print-out of license numbers of the cars parked in the lot that night did not include the number of Kyles's car. *Id.* Although the new evidence did not totally negate the prosecution's theory—because Kyles could have moved his car before the list was created and because the list was not necessarily comprehensive—the Court held that the evidence that Kyles's car was not listed was still exculpatory. *Id.*; *cf.* Fed. R. Evid. 803(7) (providing that the "Absence of a Record of a Regularly Conducted Activity" may be evidence that "the matter did not occur or exist").[3]

Relying on this line of case law, Yong asserts that the fact that the further investigation into the gambling operation failed to turn up additional evidence of Wai Kin's involvement even while it did produce additional evidence implicating his codefendants suggests that Wai Kin was not participating in the gambling scheme. Yong contends that this means probable cause regarding Wai Kin had dissipated by the time of the plea. We do not agree.

The results of the investigation did not alter the agents' observations of Wai Kin when they entered Villa 8882, or the reasonable inferences drawn from those observations. The observations of Wai Kin in Villa 8882 were consistent with his involvement in the illegal gambling operation. Monitoring the live odds of the soccer match was a task that could advance the illegal gambling operation, and Wai Kin

---

[3] These cases consider the nature of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), but are relevant here, as the Court is determining whether the results of the Government's investigation constitute exculpatory evidence.

was seated with Phua and Wai Kit, who were engaged in similar activity.

Further, while the investigation produced no additional evidence implicating Wai Kin in the operation, it is not improbable that Wai Kin was assisting the gambling operation by monitoring the live odds of the match when the agents entered the villa. Nor does the absence of additional evidence render improbable that Wai Kin could have assisted the gambling operation in ways that would not leave an electronic trail. Because probable cause does not require demonstrating actual criminal activity, only a probability or substantial chance of such activity, we cannot say the Government was without probable cause as to Wai Kin. *See Harris*, 568 U.S. at 244; *Bishop*, 264 F.3d at 924.

In sum, the investigation's failure to uncover further evidence implicating Wai Kin in the gambling operation certainly undermined the likelihood of a conviction should the Government have proceeded against him. A conviction therefore may well have been elusive for the Government. But, probable cause "is not a high bar." *Kaley*, 571 U.S. at 338. Considering the totality of the circumstances, the Government had probable cause to prosecute Wai Kin at the time of Yong's plea. *See Harris*, 568 U.S. at 244. Because probable cause remained to prosecute Wai Kin at the time of Yong's plea, the plea was not involuntary. *See McElhaney*, 469 F.3d at 385; *Vest*, 125 F.3d at 680; *Wright*, 43 F.3d at 499; *Pollard*, 959 F.2d at 1021–22; *Marquez*, 909 F.2d at 742; *Martin*, 760 F.2d at 1247–48 (11th Cir. 1985); *Harman*, 683 F.2d at 837; *Nuckols*, 606 F.2d at 569.

## C

Yong also asserts that the Government's pervasive misconduct tainted his guilty plea, rendering it involuntary

and therefore warranting reversal.  Yong's primary support for this argument is a Fourth Circuit case, *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), which interpreted *Brady v. United States*, 397 U.S. 742 (1970).

In *Brady*, the Supreme Court stated that a guilty plea is not voluntary if it was "induced by," among other things, "misrepresentation."  *Id.* at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (en banc)).  The Court in *Brady* pointed to "unfulfilled or unfulfillable promises" during plea negotiations as examples of such misrepresentation.  *Id.*  In *Fisher*, the Fourth Circuit interpreted such "misrepresentations" to include deliberate fabrications by law enforcement officers used to obtain search warrants.  There, a police officer admitted, after the defendant pleaded guilty, to lying in a sworn affidavit used to obtain the search warrant and secure evidence against the defendant.  *Id.*  Given that the defendant was completely unaware at the time of the plea of the misconduct that led to the charges against him, the Fourth Circuit concluded that "the officer's affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights."  *Id.*

Here, the district court held, after Yong entered his plea, that there had been "gross police misconduct" that "went to the heart of the prosecution's case."  The district court held that the Government submitted an affidavit in support of its search warrant application containing multiple intentional and reckless falsehoods in violation of *Franks v. Delaware*, 438 U.S. 154 (1978), and in addition that the Government conducted unconstitutional searches prior to obtaining the warrant.

Unlike in *Fisher*, however, when Yong accepted the plea deal, he was aware of the Government's misconduct, which, as the district court aptly explained, "equipped him to voluntarily choose between accepting a plea and continuing to defend" against the charges levied against him. By that time, Yong and his co-defendants had filed suppression motions outlining in detail the Government's ruse to intentionally disrupt the DSL connection as a means of entering the villas; the Government had conceded that it had entered the villas through the scheme; and the district court had scheduled the evidentiary hearing to take place in a few days time. It was only then that Yong accepted the last-minute deal.

*Fisher* relies largely on its finding that there was a "'reasonable probability' that [the defendant] would not have plead [sic] guilty, had he known of the impermissible government conduct." *Fisher*, 711 F.3d at 468 (quoting *Ferrara v. United States*, 456 F.3d 278, 294 (1st Cir. 2006)). Given Yong's awareness of the Government's misconduct and his decision to plead guilty nevertheless, we do not believe that the misconduct tainted his guilty plea or otherwise improperly induced it. *See Brady*, 397 U.S. at 755.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Yong's § 2255 motion to vacate his guilty plea.