# United States Court of Appeals
## For the First Circuit

No. 13-1637

LARRY WILKINS,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Kayatta, Circuit Judges.

George F. Gormley, with whom Stephen P. Super and George F. Gormley, P.C. were on brief, for appellant.
Dina Michael Chaitowitz, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 3, 2014

**SELYA, Circuit Judge.** In August of 2012, Massachusetts was rocked by the disclosure that Annie Dookhan, a chemist at a state testing laboratory, had falsely certified drug-test results. These revelations called into question a large number of federal and state drug convictions. This case is near the head of the parade: it marks the first time that this court has had the occasion to deal with the effect of Dookhan's skullduggery on a federal criminal conviction.

The architecture of the case is easily described. Petitioner-appellant Larry Wilkins was charged in federal court with a drug-distribution offense; the drugs were sent to the state testing laboratory; and Dookhan thereafter certified that they were crack cocaine. The petitioner subsequently pleaded guilty and went to prison.

When news of the drug-testing scandal broke, the petitioner returned to the district court and filed a motion to set aside his conviction and vacate his guilty plea. The district court refused. Concluding, as we do, that Dookhan's misconduct was not likely to have influenced the petitioner's decision to enter a guilty plea, we affirm.

I. BACKGROUND

The raw facts are largely undisputed. In April of 2011, an undercover police officer approached Ronald Merritt on the streets of Boston and signaled a desire to buy drugs. After a

-2-

brief dialogue, the officer handed $40 to Merritt, who went to retrieve the merchandise. As Merritt began to walk away, the putative buyer demanded (and received) Merritt's cell phone as temporary collateral for the $40.

Merritt crossed the street to meet with the petitioner. The petitioner gave something to Merritt, who then returned with a plastic bag presumably containing crack cocaine.

The undercover officer took the bag and returned Merritt's cell phone — but not before having Merritt dial the officer's number. The two men then parted company.

A cadre of Boston police officers had been anticipating this moment. On the undercover officer's signal, the police arrested both Merritt and the petitioner. A search revealed an additional bag of crack cocaine in Merritt's possession and a cell phone in which the undercover officer's number resided atop the call history.

The petitioner's stockpile of contraband was considerably larger. In addition to having the undercover officer's "buy" money (the serial numbers of which had been pre-recorded), the petitioner clenched a napkin containing five bags of what appeared to be crack cocaine. While en route to the police station, the petitioner discarded thirty more bags, which fell to the floor of the police cruiser. During booking, one last bag was discovered on the sole of the petitioner's shoe.

Officers inspected the stash confiscated from Merritt and the petitioner and field-tested one bag. This bag tested positive for crack cocaine. All of the bags were then shipped to a state facility, the William A. Hinton State Laboratory Institute (the Hinton Lab), for further analysis. About one month later, Annie Dookhan, a chemist at the Hinton Lab, certified that she had tested a representative sample of the bags in the petitioner's and Merritt's cases and that the tests were positive for cocaine base (crack cocaine).

In due season, a federal grand jury indicted the petitioner for possessing crack cocaine with the intent to distribute. See 21 U.S.C. § 841(a)(1). The petitioner initially maintained his innocence but, some seven months later, tendered a guilty plea.[1] At the change-of-plea hearing, he admitted that the government's version of the offense, which prominently featured the fact that the seized bags contained crack cocaine, was true. The district court accepted the guilty plea and subsequently sentenced the petitioner to a 102-month term of immurement. The petitioner did not appeal.

After the appeal period had expired, news broke of irregularities at the Hinton Lab. The investigation centered on

---

[1] Although no written agreement accompanied the petitioner's change of plea, the government made clear on the record that it had forgone the filing of an information under 21 U.S.C. § 851 in exchange for the plea.

Annie Dookhan, the chemist who had signed the drug certification in the petitioner's case. At first, the burgeoning scandal was limited to reports that Dookhan had failed to follow laboratory protocols. Further probing, spearheaded by the Massachusetts State Police, disclosed that Dookhan's perfidy ran much deeper: she had purposely contaminated certain samples to ensure that they would test positive for drugs. She also had "dry-labbed" (identified by sight, rather than by chemical test) other specimens.

The investigation culminated in the filing of a bevy of criminal charges against Dookhan. She ultimately admitted her guilt in a Massachusetts state court to charges of perjury, obstruction of justice, evidence tampering, and falsely claiming to hold a degree. See Mass. Gen. Laws ch. 266, § 89; id. ch. 268, § 1; id. § 13B(1)(c); id. § 13E(b).

Although there was no direct evidence that Dookhan had committed any transgressions with respect to this case, the petitioner moved to set aside his conviction and vacate his guilty plea based on the scandal. Construing the motion as a petition for post-conviction relief under 28 U.S.C. § 2255, the district court denied it. See United States v. Wilkins, 943 F. Supp. 2d 248, 254, 259 (D. Mass. 2013). The court subsequently granted a certificate of appealability, see 28 U.S.C. § 2253(c)(1)(B), limited to the issue of whether the petitioner's plea was voluntary within the purview of Brady v. United States, 397 U.S. 742 (1970). See United

States v. Wilkins, 948 F. Supp. 2d 87, 89 & n.3 (D. Mass. 2013); see also Brady, 397 U.S. at 755 (holding that a "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation . . . , or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business"). This timely appeal followed.

## II. ANALYSIS

We start by clarifying the controlling legal standard. Although the petitioner insistently invokes the "fair and just reason" standard of Federal Rule of Criminal Procedure 11(d)(2)(B), that standard applies only to attempts to vacate a guilty plea arising "after the court accepts the plea, but before it imposes sentence." Fed. R. Crim. P. 11(d)(2). Where, as here, a defendant first seeks to vitiate his guilty plea after sentencing, he "may not withdraw [the] plea of guilty . . . , and the plea may be set aside only on direct appeal or collateral attack." Fed. R. Crim. P. 11(e). Because the petitioner did not pursue a direct appeal from his conviction and sentence, the only avenue of relief that remains open to him is a collateral attack.

That path is a narrow one, demarcated here by the jurisprudence of 28 U.S.C. § 2255. The petitioner bears the burden of demonstrating that he can successfully traverse the path. See David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). He

-6-

faces an arduous trek: as a general matter, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984).

But this path is not necessarily a dead end. Among other things, "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea." Ferrara v. United States, 456 F.3d 278, 289 (1st Cir. 2006); see Machibroda v. United States, 368 U.S. 487, 493 (1962). In this instance, the petitioner pins his hopes on such a ground.

To prevail on this kind of claim, a convicted defendant who asserts a right to rescind his guilty plea because of newly discovered government misconduct must make two showings. "First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea." Ferrara, 456 F.3d at 290. "Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." Id.

The parties vigorously dispute whether the petitioner has made the first showing. According to the petitioner, Dookhan's conduct was both egregious and attributable to the government by virtue of Dookhan's relationship to the prosecution team. The

-7-

government demurs, arguing that the federal sovereign cannot and should not be held responsible for the misfeasance of a laboratory worker employed by a separate sovereign (the state). In this regard, it notes that the federal prosecutors were themselves blameless.

We need not resolve this contretemps. To succeed, the petitioner must carry the devoir of persuasion on both elements of the Ferrara framework, and his obvious inability to make the second of the two required showings dooms his appeal. We therefore turn directly to that element: materiality.

To satisfy this requirement, the petitioner "must show 'a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial.'" Id. at 294 (alteration in original) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). For this purpose, a reasonable probability means "a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." Id.

When the misconduct involves newly emergent evidence not previously disclosed, the probability assessment "will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." Hill, 474 U.S. at 59. This inquiry demands the use of an objective standard. See Ferrara, 456 F.3d at 294.

The trial court plays a pivotal role in fashioning this probability assessment. On appeal, its factual findings must be accepted unless those findings are clearly erroneous. See id. at 295. Its ultimate conclusion, however, constitutes a legal judgment that is subject to de novo review. See id.

Here, the district court concluded that the petitioner failed to show a reasonable probability that he would have insisted on a trial had he known of Dookhan's misconduct. In reaching this conclusion, the court supportably determined that the evidence of the petitioner's guilt was "overwhelming." Wilkins, 943 F. Supp. 2d at 258. To begin, the circumstances of the sale to the undercover officer and the petitioner's role in it comprised powerful circumstantial evidence. And there was more: the transaction followed the pattern of a prototypical street corner drug buy; a field test of one of the seized bags proved positive for crack cocaine; and the petitioner was arrested with a stockpile of similar bags. See id. at 251.

The petitioner concedes, as he must, that Dookhan bears no relationship to this mass of circumstantial evidence. He focuses instead on the only point at which his case intersects with Dookhan: whether the bags seized from him actually contained crack cocaine. He theorizes that because the chemist who certified the contents of the bags as crack cocaine (Dookhan) has now been

disgraced, his newfound ability to lay siege to Dookhan ought to shake our confidence in his guilty plea.

This theory elevates hope over reason. After the petitioner moved for section 2255 relief, the government commissioned new testing by a different chemist. This second round of testing was performed exclusively on samples that the district court found were "untouched" by Dookhan. Id. at 258 n.10. Such a supplemental evaluation was possible because Dookhan had "tested only random samples of the drugs seized," id., leaving some thirty-one virgin bags untouched and untested, see id. at 252. Of these, thirteen randomly selected bags were tested by the second chemist and were found to be positive for the presence of cocaine. See id. at 252-53. These uniform results set to rest any real doubt about the nature of the merchandise purveyed by the petitioner.

Undaunted, the petitioner labors to discredit these results because, in his view, the mere presence of the virgin samples at the Hinton Lab during Dookhan's tenure corrupts the chain of custody. Dookhan's wrongdoing was so malignant, his thesis runs, that it infected everything that was at the Hinton Lab.

This miasmic theory of evidentiary corruption has little to commend it. Critically, the petitioner has done nothing to defile the district court's factual finding that the bags involved

in the second round of testing were "untouched" by Dookhan.[2]  Id. at 258 n.10.  This finding is not clearly erroneous — indeed, the record does not permit any contrary inference — and the petitioner has not explained how Dookhan could have contaminated the virgin bags without touching them.

The petitioner interposes two other objections to the district court's consideration of the second round of testing.  His first plaint — that evidence of these test results came by way of the second chemist's affidavit, without an evidentiary hearing — is jejune.  The petitioner did not request an evidentiary hearing, and there was no evident need for one.  In such circumstances, the petitioner cannot be heard to complain that the district court did not convene an evidentiary hearing sua sponte.  See United States v. Mala, 7 F.3d 1058, 1062 (1st Cir. 1993); Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 20 n.4 (1st Cir. 1992).

The petitioner's second plaint focuses on the decision in Commonwealth v. Scott, 5 N.E.3d 530 (Mass. 2014).  There, the Massachusetts Supreme Judicial Court (SJC) applied our two-part Ferrara framework to a state criminal defendant who was seeking to withdraw his guilty plea, post-conviction, because of Dookhan's

---

[2] By the same token, there is no evidence that Dookhan might have expected that anyone else would ever test those bags.  It follows that there is no reason to suspect that she took the time and trouble to open, contaminate, and close each one.

misconduct. In the course of remanding for factfinding, the SJC prohibited the trial justice from "consider[ing] any assertion by the Commonwealth that it would have offered to retest the substances at issue in the defendant's case if the defendant had known of Dookhan's misconduct." Id. at 548. Crediting any such assertion "would require a court to heap inference upon inference and will bring the inquiry . . . too far afield of the facts and circumstances actually known to the defendant at the time of his guilty plea." Id.

This case is a horse of a different hue, and the Scott prohibition has no bearing here. The second round of testing here was not an attempt to create a hypothetical scenario but, rather, produced test results concerning bags that nobody had previously purported to test. The distinction is readily apparent: contrary to the hypothetical inquiry that Scott prohibits, the results of the second round of testing are concrete, definitive, and susceptible to intelligent analysis.

The petitioner has another shot in his sling. At oral argument, his counsel offered a different slant on the effect of Dookhan's skullduggery. He speculated that he might have urged a jury to make his client's trial a referendum on Dookhan rather than a proceeding aimed at determining his client's guilt or innocence. Refined to bare essence, this importuning asks us to find materiality based on the possibility of jury nullification. But

courts are duty-bound to presume that jurors will follow their instructions, see United States v. Olano, 507 U.S. 725, 740 (1993); Evans v. Avery, 100 F.3d 1033, 1041 (1st Cir. 1996), and there is no principled way in which we can rely on a petitioner's hope of jury nullification to find prejudice. See, e.g., Sorich v. United States, 709 F.3d 670, 678 (7th Cir. 2013), cert. denied, 134 S. Ct. 952 (2014); United States v. Allen, 406 F.3d 940, 949 (8th Cir. 2005) (en banc).

There is one last point. The petitioner, unlike the petitioner in Ferrara, admitted his factual guilt (including the nature of the contraband sold) in open court at the time that he changed his plea. This admission is entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack. See, e.g., Campbell v. Marshall, 769 F.2d 314, 321-22 (6th Cir. 1985). And such an admission is especially compelling because the petitioner neither attempts to explain it away nor makes any assertion of factual innocence. Cf. United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994) (explaining that the absence of a claim of innocence "cuts sharply against allowing [a defendant's] motion to withdraw his guilty plea" when a fair and just reason is required for plea withdrawal).

## III. CONCLUSION

We need go no further. We write without attempting to lay down any broad rule to govern all Dookhan-related cases. Rather, our decision rests on the facts and circumstances of the petitioner's case. To prevail, he must convince us that there is a reasonable probability that, considering the totality of the circumstances, he would not have pleaded guilty had he known of Dookhan's transgressions. See Ferrara, 456 F.3d at 294. Given the overwhelming evidence of the petitioner's guilt and the fact that the Dookhan scandal, though sensational, does not provide him a viable defense, the petitioner manifestly failed to cross this threshold. Thus, he is not entitled to any relief.

**Affirmed.**

-14-