*Dale K. Byrd v. State of Maryland*, No. 4, September Term, 2020

**CRIMINAL LAW – DISCOVERY**

Prior to a defendant entering a pretrial guilty plea, the State is under no constitutional obligation to provide a defendant with evidence that could be used to impeach a State's witness.

**CRIMINAL LAW – DISCOVERY**

The failure by the State to provide evidence to the defendant, prior to pleading guilty, that could be used to impeach a State's witness does not constitute a misrepresentation by the State regarding the credibility of that witness under *Brady v. United States*.

Circuit Court for Baltimore City
Case Nos. 110085017, 110235023
Argued: October 5, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 4

September Term, 2020

DALE K. BYRD

v.

STATE OF MARYLAND

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

Opinion by Barbera, C.J.

Filed: November 20, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In March 2011, Petitioner, Dale K. Byrd, pled guilty at a hearing in the Circuit Court for Baltimore City to having committed, in two separate cases, the crime of possession of heroin with intent to distribute it. Petitioner was sentenced to concurrent sentences of twelve years' incarceration, all but four years suspended, and three years' probation. In 2018, upon completion of the sentences and probation, Petitioner filed in the Circuit Court for Baltimore City a petition for issuance of a writ of error coram nobis. The circuit court denied the petition. The Court of Special Appeals affirmed the decision of the circuit court.

Petitioner now turns to this Court for the coram nobis relief he heretofore has been unable to obtain. He argues that the State failed to disclose to him, prior to his entry of the two guilty pleas, information relating to alleged misconduct of several of the officers involved in the arrests that prompted the subsequent charges and pleas. We are asked to determine whether the nondisclosure of that evidence of misconduct—which related not to the officers' actions in Petitioner's arrests but instead to their conduct in other cases—is sufficient to render the pleas involuntary.[1]

Petitioner contends that the nondisclosure of the officers' misconduct constitutes a suppression of impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and an implicit misrepresentation under *Brady v. United States*, 397 U.S. 742 (1970). We hold, first, that the Supreme Court's holding in *United States v. Ruiz*, 536 U.S. 622 (2002) establishes that the right to impeachment evidence under *Brady v. Maryland* is exclusively

---

[1] As the Supreme Court has done, for the purposes of a guilty plea we will use the term voluntary as meaning intelligent, knowing, sufficiently aware, and free from coercion. *See, e.g.*, *United States v. Ruiz*, 536 U.S. 622, 629 (2002).

a trial right. Thus, the State was under no obligation to disclose the potential evidence of misconduct to Petitioner prior to trial. We also hold that the nondisclosure did not constitute a misrepresentation in violation of *Brady v. United States*, as the State made no representation to Petitioner regarding the credibility of the officers at issue, and the alleged officer misconduct bore no relation to the charges to which Petitioner pled guilty. Therefore, the nondisclosure of the information did not render Petitioner's guilty pleas involuntary.

Consequently, we affirm the judgment of the Court of Special Appeals upholding the circuit court's denial of coram nobis relief.

## I.

### Facts and Procedural History

The dispositive facts in this case are not in dispute. On March 11, 2011, Petitioner pled guilty in the two separate cases, noted above, to possession of heroin with the intent to distribute. As to the first case, No. 110085017, the State proffered the following facts in support of the plea.

On March 19, 2010, between 10:00 a.m. and 10:30 a.m., several Baltimore City police officers, including Officer Daniel Hersl, observed the 1700 block of Darley Avenue in Baltimore City from a covert location. The officers observed Petitioner standing on the porch of 1742 Darley Avenue, a vacant dwelling, when several unknown males approached him. Following a conversation between Petitioner and the unknown individuals, Petitioner retrieved small objects from beneath the molding cap of a pole on the porch, which he

exchanged with those individuals for U.S. currency. The officers suspected that the objects contained a controlled dangerous substance. After several transactions, Petitioner walked across the street and entered the vacant dwelling at 1749 Darley Avenue. After approximately one minute, the officers observed him return to 1742 Darley Avenue and place several items under the molding cap.

Suspecting that Petitioner was using 1749 Darley Avenue as a stash house, the officers placed him under arrest. The officers then recovered three clear gel caps of suspected heroin from beneath the molding cap at 1742 Darley Avenue, in addition to seventy-five gel caps of suspected heroin from the living room of 1749 Darley Avenue. The evidence was submitted to the Evidence Control Unit where it tested positive as heroin, a Schedule I narcotic. The State indicated that, if called to testify at trial, the officers would identify Petitioner and state that the amount of heroin and the circumstances under which it was recovered indicated that it was not for personal use and that Petitioner intended to distribute it.

The State then proffered the following facts in support of Petitioner's guilty plea in the second case, No. 110235023. On August 9, 2010, at 6:50 p.m., Baltimore City officers received information from a confidential informant that a male was selling narcotics from a vacant house at 1749 Darley Avenue. Officer Thomas Wilson went to the 1700 block of Darley Avenue and observed Petitioner, matching the description given by the informant, speaking with an unknown individual. Petitioner then went to the porch of 1749 Darley Avenue and retrieved suspected narcotics from the front doorframe, which he then handed

3

to the unknown individual.  Officer Wilson arrested Petitioner and recovered $356 from his person.  He also retrieved one gel cap from the doorframe, which later tested positive as containing heroin.  The State indicated that if called to testify at trial, the officer would identify Petitioner and state that the circumstances under which the heroin was recovered indicated that it was not for personal use and that Petitioner intended to distribute it.

In both cases Petitioner affirmed under oath to the court that the facts as proffered by the State were true.  The court found there to be a factual basis in both cases and accepted Petitioner's pleas.  The court then sentenced Petitioner to twelve years of incarceration on both counts to run concurrently, with all but four years suspended, in addition to three years of probation.

*Undisclosed Misconduct of Officer Hersl and Officer Wilson*

The first case

In relation to the arrest on March 19, 2010, Officer Daniel Hersl was one of the observing officers and swore out the Statement of Charges, so he likely would have been called to testify had the case gone to trial.  Petitioner now claims that there were Internal Investigations Division records that impugned Officer Hersl's credibility that were not provided to Petitioner prior to his pleas.  A *Baltimore Sun* article[2] from 2018, which Petitioner introduced as an exhibit at his coram nobis hearing, stated that Hersl had

---

[2] Justin Fenton, *Baltimore Police Sergeant Named by Witness in Corruption Trial Was Cited for Misconduct in Past*, BALT. SUN (Feb. 9, 2018), https://www.baltimoresun.com/news/crime/bs-md-ci-wilson-termination-20180202-story.html [https://perma.cc/U95V-AB45].

"amassed dozens of complaints" that resulted in settlements in three civil suits against him. The *Sun* article further indicated that Officer Hersl, a former member of the infamous Baltimore Gun Trace Task Force, was also facing trial for his involvement in a criminal racketeering enterprise.

At the coram nobis hearing, Petitioner also submitted several orders from unrelated cases in which three judges[3] all independently determined, after *in camera* review of Officer Hersl's internal investigations records, that there was information in the records that should have been discoverable to other criminal defendants. However, the State had not informed Petitioner of any of this prior to his guilty plea in the first case against him.[4]

The second case

In relation to the arrest on August 9, 2010, Officer Wilson was the sole observing, arresting, and submitting officer. He also swore out the Statement of Charges. Therefore, Officer Wilson likely would have been the only officer to testify for the State had the case gone to trial. The *Baltimore Sun* article Petitioner relied upon during his coram nobis hearing also contained allegations relating to Officer Wilson. The article explained that the Baltimore Police Department's Internal Investigations Division recommended that Officer Wilson be terminated in 2005 after he allegedly entered a home without a warrant,

---

[3] The orders were issued by Judge Nugent of the Circuit Court for Baltimore City, Judge Hollander of the United States District Court for the District of Maryland, and Judge Prevas, formerly of the Circuit Court for Baltimore City.

[4] Although Officer Hersl was only indicted for racketeering in 2017—several years after Petitioner's guilty pleas—Petitioner's coram nobis counsel argued that it is likely that Officer Hersl had been engaging in that conduct for some time prior to the charges.

obtained a warrant afterwards, and then falsified paperwork to suggest that the warrant had been obtained prior to entering the home. The article stated that the police trial board subsequently found him guilty of misconduct and neglect of duty, recommended that he be suspended for fifteen days without pay, and issued a "severe letter of reprimand." The article also indicated that in 2003 a federal judge[5] had accused Officer Wilson of lying in court. The State likewise had not informed Petitioner of any of Officer Wilson's alleged misconduct prior to Petitioner's guilty plea in the second case against him.

For purposes of evaluating Petitioner's arguments, and in the interest of judicial economy, we will assume that some or all of the allegations of police misconduct against Officers Hersl and Wilson are detailed in the officers' internal investigations records and were valid and well-founded.[6] We do note, however, that neither the circuit court nor the Court of Special Appeals made any such express findings.

*Coram Nobis Proceedings*

On January 25, 2018, after completing his sentence and period of probation, Petitioner filed a petition for writ of error coram nobis with respect to both convictions in the Circuit Court for Baltimore City. Precipitating this petition is his involvement in a criminal matter now pending in the United States District Court for the District of

---

[5] Coram nobis counsel identified the federal judge as Judge Andre Davis, then of the United States District Court for the District of Maryland.

[6] Additional evidence substantiating Petitioner's claims as to the contents of the files would not disturb our conclusion. Therefore, we decline Petitioner's request for a limited remand under Maryland Rule 8-604 to further develop the record.

Maryland, in which Petitioner has pled guilty but has yet to receive his sentence. His plea agreement in that case indicates that the government will suggest a sentence of between ten and fifteen years of incarceration at the sentencing hearing. According to Petitioner, if he is successful in vacating the two pleas at issue here, the federal court may be more likely to sentence him to the minimum of ten years.

Petitioner argued in his coram nobis petition that the undisclosed evidence of police misconduct detailed in the *Baltimore Sun* article and suggested by the three judges' findings regarding Officer Hersl's internal investigations files rendered his waiver of his right to trial involuntary and constituted a violation of *Brady v. Maryland*. The State filed an answer to his petition on February 26, 2018. Petitioner then filed an amended petition on April 4, 2018. That same day the circuit court held the coram nobis hearing.

At the hearing, Petitioner testified that he would have considered the undisclosed information in relation to Officers Wilson and Hersl important and that had he known about it he would not have pled guilty to the charges. Petitioner did not, however, indicate that he was innocent of the charges. The State conceded that the potential for increased sentencing in the federal matter constituted a significant collateral consequence and that there were no other mechanisms by which Petitioner could challenge his guilty pleas. The State did dispute, though, whether a constitutional or fundamental right was in question. After the hearing the parties submitted supplemental briefing.

The circuit court denied Petitioner's petition for writ of error coram nobis, finding that none of his constitutional or fundamental rights were violated. Petitioner then

7

appealed that denial to the Court of Special Appeals. In a reported opinion, dated December 19, 2019, the Court of Special Appeals affirmed the circuit court's denial of coram nobis relief.[7] *Byrd v. State*, 243 Md. App. 616 (2019). We granted certiorari to determine whether the nondisclosure of the evidence of police misconduct constituted either a violation of the State's disclosure obligations under *Brady v. Maryland* or a misrepresentation under *Brady v. United States*, thereby invalidating Petitioner's guilty pleas.[8] For reasons that follow, we answer those questions in the negative and affirm the judgment of the Court of Special Appeals.

---

[7] The Court of Special Appeals initially issued an opinion dated November 1, 2019, also affirming the denial of relief. Petitioner then filed a motion for reconsideration. By way of order issued December 18, 2019, the Court of Special Appeals denied Petitioner's motion for reconsideration, withdrew its November 1 opinion, and indicated that a new opinion would be filed forthwith.

[8] Petitioner framed the issues in his petition for writ of certiorari as follows:

> 1. Did the Court of Special Appeals err in holding that Petitioner's guilty pleas were valid even though the State did not disclose material impeachment evidence about key police witnesses (including evidence of lying in federal court and falsifying a warrant)?
>
> > a. Did the non-disclosure of the evidence violate the State's constitutional discovery obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny?
> >
> > b. Did the non-disclosure of the evidence constitute a misrepresentation by the State rendering the pleas invalid under *Brady v. United States*, 397 U.S. 742 (1972), and its progeny?

We interpret the two sub-questions to be collectively exhaustive of how the first question could be resolved in favor of Petitioner in this case. In other words, there is no residual due process or other constitutional or fundamental right at play here that is not likewise waived in the context of a guilty plea. *See Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (enumerating the constitutional rights waived through a guilty plea). Therefore, we frame this appeal as primarily addressing only the two sub-issues.

## II.

## Discussion

"'Because of the "extraordinary" nature' of a coram nobis remedy, we review a court's decision to grant or deny such a petition for abuse of discretion." *Hyman v. State*, 463 Md. 656, 674 (2019) (quoting *State v. Rich*, 454 Md. 448, 470–71 (2017)). "In determining abuse of discretion, however, an appellate court 'should not disturb the *coram nobis* court's factual findings unless they are clearly erroneous, while legal determinations shall be reviewed *de novo*.'" *Id.* (quoting *Rich*, 454 Md. at 471).

A petition for writ of error coram nobis is a common law means through which a person who has been convicted of a crime but is no longer incarcerated, on parole, or on probation can challenge the validity of the conviction based on an alleged error of fact or law. *See generally Skok v. State*, 361 Md. 52 (2000) (discussing the history of the writ and extending its application to errors of law). In order for a court to issue a writ of error coram nobis, the petitioner must establish that the following five conditions obtain:

> [1] "the grounds for challenging the criminal conviction must be of a constitutional, jurisdictional, or fundamental character"; [2] the petitioner has . . . overcome the [burden of the] "presumption of regularity" in the criminal case; [3] "the coram nobis petitioner must be suffering or facing significant collateral consequences from the conviction"; [4] the issue must not be waived; and [5] there may be no other "statutory or common law remedy [ ] then available."

*Hyman*, 463 Md. at 672 (quoting *State v. Smith*, 443 Md. 572, 599 (2015)) (final alteration in original).

9

The only condition that the State disputes here is whether the grounds for challenging Petitioner's guilty pleas and convictions in this case are of a constitutional or fundamental character.[9] "A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)); *see also Ruiz*, 536 U.S. at 628–29 ("When a defendant pleads guilty he or she, of course, forgoes not only a fair trial, but also other accompanying constitutional guarantees.") (citation omitted). These important rights include defendants' Fifth Amendment right not to be compelled to testify against themselves, in addition to their Sixth Amendment rights to a fair and impartial jury trial and to confront witnesses testifying against them. *See Boykin*, 395 U.S. at 243. Thus, to the extent Petitioner can establish that his guilty pleas were not voluntary, he will have established that he was denied important constitutional rights and accordingly will have met his burden under the first prong of the coram nobis analysis as outlined above.

## A. *Brady v. Maryland*

*Brady v. Maryland* and its progeny guarantee to a criminal defendant who stands trial the right to receive material exculpatory and impeachment evidence in the possession

---

[9] Given our holding that Petitioner has not satisfied his burden as to the constitutional or fundamental character of his grounds for challenge, we need not engage in an independent analysis of any of the other necessary conditions for the issuance of a writ of error coram nobis.

10

of the State. *See Brady v. Maryland*, 373 U.S. 83; *Giglio v. United States*, 405 U.S. 150 (1972). Petitioner argues that this authority entitled him to receive the undisclosed information relating to the police misconduct of Officers Hersl and Wilson prior to his guilty pleas. He contends that the undisclosed information indicates a lack of honesty and could have been used at trial to impeach the officers' credibility. Given that he was deprived of this information, argues the Petitioner, his guilty pleas were not voluntary.

Unfortunately for Petitioner, the Supreme Court held eighteen years ago, in *United States v. Ruiz*, 536 U.S. 622 (2002), that the right to information under *Brady v. Maryland* is a trial right, and is accordingly waived along with the other constitutional guarantees that a defendant forgoes when waiving the right to trial. In *Ruiz*, immigration agents found 30 kilograms of marijuana in Ms. Ruiz's luggage. *Ruiz*, 536 U.S. at 625. Federal prosecutors presented her with a "fast track" plea bargain under which she would waive indictment, trial, and appeal in exchange for the government's recommendation of a two-level downward sentencing departure. *Id.* By accepting the plea, Ms. Ruiz also would have "'waiv[ed] [her] right' to receive 'impeachment information relating to any informants or other witnesses' as well as the right to receive information supporting any affirmative defense [she would raise] if the case [went] to trial." *Id.* (citation omitted). Ruiz refused to accept the plea on the basis of the last-mentioned waiver and was indicted for unlawful drug possession. *Id.* She then pled guilty in the absence of any agreement with the government. *Id.* at 625–26. At the sentencing hearing she asked the court to grant her the two-level departure outlined in the proposed plea, but the court denied the departure. *Id.*

11

at 626. Ruiz appealed her sentence, which the Ninth Circuit vacated, finding that the fast track plea's waiver of the right to impeachment information was unconstitutional. *Id.*

The Supreme Court reversed, holding that the Constitution does not "require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses.'" *Id.* at 625 (citation omitted). The Court cited three considerations undergirding this ruling. "First, impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')." *Id.* at 629 (alteration in original). "Second, . . . this Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances." *Id.* at 630 (citations omitted). Rather, it "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." *Id.* (citations omitted); *see also Brady v. United States*, 397 U.S. at 757 ("A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case.").

The third reason offered by the *Ruiz* Court was that the interests of due process, on balance, weighed against a requirement that the defendant receive all possible impeachment evidence in relation to the prosecution's witnesses prior to trial. *Ruiz*, 536 U.S. at 631–32. On the one hand, given that the fast track plea agreement at issue still required the prosecution to provide the defendant with evidence of factual innocence, the

12

value of also receiving impeachment evidence—which itself varies widely in importance—was minimal. *Id.* at 631. On the other hand was the weighty concern that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." *Id.*

In an attempt to distinguish this case, Petitioner relies on Justice Thomas's concurrence in *Ruiz*, which suggests that the holding of the majority opinion "turns in some part on the 'degree of help' such information would provide to the defendant at the plea stage, a distinction that is neither necessary nor accurate." *Id.* at 633 (Thomas, J., concurring in the judgment) (internal citation omitted). Justice Thomas went on to state that "[t]o the extent that the Court is implicitly drawing a line based on a flawed characterization about the usefulness of certain types of information, I can only concur in the judgment." *Id.* at 633–34. Thus, under Justice Thomas's view, the majority opinion in *Ruiz* leaves open the possibility that some evidence may be so crucial as to imbue the defendant with a pretrial right thereto under *Brady v. Maryland*. Petitioner shares this view and argues that this is such a case, given that the officers "played instrumental roles in each of Mr. Byrd's cases" and the undisclosed evidence "cut to the core of the officers' veracity."

We do not read the *Ruiz* Court's majority opinion as leaving open any such possibility. It is true that the majority opinion twice mentions the often limited and variable

13

nature of the value of impeachment evidence, but the majority does so merely in support of its conclusion that there is no pretrial right to impeachment evidence under *Brady v. Maryland*. *See id.* at 630, 631. Nowhere in that opinion does Justice Breyer, writing for the majority, indicate that in some cases the evidence may be so important as to disrupt this straightforward and unequivocal holding.

*Ruiz* clearly establishes that the right to impeachment evidence under *Brady v. Maryland* in all cases is exclusively a trial right. Even assuming that the undisclosed misconduct information in this case were actually critical to Petitioner's case, it would still be fundamentally incapable of converting that trial right into a pretrial right. Although Justice Thomas's concurrence reads the majority's holding in a different light, this principle is the very thrust of his concurring opinion.[10]

Under *Brady v. Maryland* the petitioner must establish that the undisclosed evidence: (1) would have been favorable to the defense at trial, (2) was suppressed or withheld, and (3) was material. *See Yearby v. State*, 414 Md. 708, 717 (2010). Thus, the

---

[10] The Maryland Criminal Defense Attorneys' Association, as amicus curiae, argues that the holding in *Ruiz* was limited to the facts of the case, and quotes the following in support: "in the context of this agreement, the need for this information is more closely related to the *fairness* of a trial than to the *voluntariness* of the plea." *Ruiz*, 536 U.S. at 633. Amicus curiae overlooks the fact that there were two separate holdings in *Ruiz*, the latter relating to whether the fast track plea agreement's requirement that the defendant waive the "right" to receive information relating to affirmative defenses was also valid. The quoted statement was made solely in relation to that holding. There is no such limitation with respect to the Court's holding on impeachment evidence. Amicus curiae also cites to recent legislative efforts designed "to ensure that relevant information is disclosed to defendants before trial." We deal here only with what is mandated by the Constitution, not with policy decisions of the state legislature on the unrelated topic of disclosure involving in-person witness testimony.

importance of the undisclosed evidence to the defendant's case is indeed a consideration under *Brady v. Maryland*, as it is critical to the determination of materiality under the final prong of the test. The Supreme Court has explained that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Thus, Petitioner's claim that the undisclosed evidence in this case would have been important to him and may have affected his decision to plead guilty—which, theoretically, could have affected his guilty verdict—would in fact be relevant to the analysis under *Brady v. Maryland*. However, as *Brady v. Maryland* simply does not apply to impeachment evidence prior to trial, determining whether *Brady v. Maryland*'s third prong is satisfied in the context of a guilty plea is a purely academic exercise.

Given our holding, we need not determine with precision how important the undisclosed evidence may have been to Petitioner's case. However, we do reject Petitioner's analogy to the writ of actual innocence context, where this Court has declined to adopt an "overly rigid" distinction between "impeaching" and "merely impeaching" evidence. *State v. Hunt*, 443 Md. 238, 263–64 (2015). Petitioner is correct that the Court in *Hunt* acknowledged that, at least within the context of the standard for granting a new trial based on newly discovered evidence, the hearing judge is free to consider both impeachment evidence that is directly related to the case and that which is not. *See id.*; *see also Snead v. State*, 224 Md. App. 99, 110 (2015) (holding that "[i]n light of *Hunt*, . . . a

petition [for writ of actual innocence] is not necessarily doomed, even on a hearing on the merits, solely because it depends on evidence that 'merely' impeaches a witness's testimony") (citation omitted). Under *Hunt*'s analysis, assuming it has any application here,[11] it would thus not be fatal to Petitioner's claim that the evidence of alleged police misconduct was wholly unrelated to Petitioner's case. The hearing judge would still have the discretion to consider it as impeachment evidence as it bore in relation to the validity of his pleas.

But this case does not turn on any distinction, or lack thereof, between "impeaching" and "merely impeaching" evidence. Petitioner's claim under *Brady v. Maryland* instead turns on the distinction between impeachment evidence and exculpatory evidence. Impeachment evidence writ large under *Ruiz*, no matter how important, is treated differently than exculpatory evidence, and the prosecution is not required to produce it to the defendant prior to trial. *Accord United States v. Wilkins*, 943 F. Supp. 2d 248 (D. Mass. 2013) (finding that *Ruiz* did not require the prosecutor to disclose the prosecution's chemist's extensive history of fraud prior to the defendants pleading guilty to narcotics charges because it would not have constituted exculpatory evidence), *aff'd*, 754 F.3d 24 (1st Cir. 2014), *and aff'd sub nom. United States v. Merritt*, 755 F.3d 6 (1st Cir. 2014).

We also reject Petitioner's intimation that there is no real or meaningful difference between exculpatory and impeachment evidence. Not surprisingly, Petitioner cites to no

---

[11] We question whether *Hunt*'s analysis is relevant in this context, considering that, as noted by the Court of Special Appeals, *Hunt* dealt with a (post)trial right, not a pretrial right.

authority that could be read to support this bald assertion, and we decline to depart from well-established precedent distinguishing the two. *E.g.*, *Adams v. State*, 165 Md. App. 352, 380–81 (2005) ("Exculpatory evidence is the sort of thing that may be offered by the defense as substantive evidence on the ultimate merits. Impeachment evidence, by contrast, is a more peripheral thing. It may assist the defense in its cross-examination of an adverse witness. It is not, however, exculpatory *per se*. It is not even relevant until the witness testifies, whereas exculpatory evidence is always relevant.").

Finally, we find it significant, though not dispositive, that Petitioner expressly affirmed under oath that the facts proffered by the State at the guilty plea hearing were true. At no point during the course of this case has he suggested that in doing so he was not being honest or that he is in fact innocent of the charges. As the Supreme Court stated in *Brady v. Maryland*, we "find no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops that the State would have had a weaker case than the defendant had thought." 397 U.S. at 757. *Brady v. Maryland* has no application in this case, and Petitioner cannot rely upon it to invalidate his guilty pleas.[12]

---

[12] The State also argues that coram nobis counsel failed to identify specific evidence that would have been discoverable in Petitioner's cases, and takes issue with the fact that coram nobis counsel did not request review of the officers' internal investigations files. We need not reach these potential issues, nor Petitioner's responses, as our holding is not in any way tied to the actions of coram nobis counsel below.

B. *Brady v. United States*

We turn next to Petitioner's argument that even if *Ruiz* forecloses the application of *Brady v. Maryland*, the State's failure to provide him with the impeachment evidence against Officers Hersl and Wilson, while simultaneously holding them out as credible witnesses for the State, constituted a misrepresentation under *Brady v. United States*. That misrepresentation, argues Petitioner, rendered his guilty pleas involuntary. We likewise hold that Petitioner is unable to rely upon the principles espoused in *Brady v. United States*, given that the State never actually made any representation to Petitioner regarding the credibility of its witnesses. Moreover, even were we inclined to find that the State's conduct in this case amounted to some sort of implicit misrepresentation, the information that the State did not disclose to Petitioner had no connection to Petitioner's case.

In *Brady v. United States*, the Court cited with approval the following standard for determining whether a guilty plea is voluntary:

> [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), *misrepresentation* (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady v. United States*, 397 U.S. at 755 (alteration in original) (emphasis added) (citation omitted).

Petitioner seizes on the exception for pleas induced by misrepresentations, arguing that "the State, prior to Mr. Byrd pleading guilty, implicitly held out the officers as credible

18

witnesses who were untarnished by findings to the contrary." Petitioner argues that by not disclosing to him the various instances of the misconduct of Officers Hersl and Wilson, the State thus made an implicit misrepresentation regarding their credibility. Petitioner claims that this misrepresentation in turn induced him to plead guilty involuntarily.

The record does not show—and Petitioner does not contend—that at any point the State made any affirmative statements to him or his counsel regarding the credibility of the officers that it intended to call at trial. Petitioner cites to no authority for the proposition that this seemingly commonplace absence of any such statement by the State to a defendant can constitute a misrepresentation. Instead, Petitioner strings together authority from several distinct factual and legal contexts and asks this Court to create new law.

Petitioner relies primarily on *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), wherein the Fourth Circuit held that the defendant's guilty plea was not voluntary. There, one of the arresting officers later pled guilty to deliberately including false statements in the sworn affidavit that was used as the sole basis to obtain the search warrant that led to Fisher's charges. *Fisher*, 711 F.3d at 462–63. The *Fisher* court cited to the First Circuit's opinion in *Ferrara v. United States* for the proposition that:

> [T]o set aside a plea as involuntary, a defendant who was fully aware of the direct consequences of the plea must show that (1) "some ***egregiously impermissible conduct*** (say, threats, ***blatant misrepresentations***, or untoward blandishments by government agents) antedated the entry of his plea" and (2) "the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice."

*Id.* at 465 (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)) (some emphasis added).

19

Applying this standard to Petitioner's case, and assuming arguendo that the State made an implicit misrepresentation to Petitioner merely by offering witnesses for trial without providing him with the police misconduct information, that conduct was not "egregiously impermissible" and that implicit misrepresentation certainly was not "blatant." Thus, Petitioner's case fails to meet the first prong of the standard articulated in *Fisher*, and we need not reach the second. The Fourth Circuit in *Fisher* also acknowledged that the court was compelled to hold that the plea was involuntary because it was an "extraordinary case" that presented "highly uncommon circumstances in which gross police misconduct [went] to the heart of the prosecution's case." *Id.* at 462, 466. Simply put, Petitioner's case is not an extraordinary one, and the alleged misconduct that Petitioner relies upon did not go to the heart of his case.

*Fisher* is further distinguishable from this case on two factual grounds. First, in *Fisher*, the police officer made assertions in a sworn affidavit that he later admitted were not true. *Id.* at 462–63. There is nothing to indicate that the State made any statements, sworn or otherwise, to Petitioner regarding the general credibility of Officers Wilson or Hersl. Second, the misrepresentations in the affidavit in *Fisher* formed the foundation for the search warrant that led to the discovery of the evidence substantiating Fisher's charges. *Id.* Thus, Fisher's plea was not involuntary merely because the officer's credibility could have been impeached. Rather, the constitutionality of the search leading to his charges was impugned. Here, the alleged misconduct of Officers Hersl and Wilson that Petitioner relies upon was wholly unrelated to the charges in the two cases underlying Petitioner's current

20

claim, and he adduced no evidence that directly related to anything that the officers did with respect to his arrests. Petitioner's appeal to *Ferrara* is likewise unavailing, as it puts forth the very standard adopted in *Fisher* and pertained to affirmative misrepresentations and withholding of evidence going to the heart of Ferrara's case.[13] *See Ferrara*, 456 F.3d at 290, 293.

It is also worth noting that the court in *Fisher* based its decision in part on the importance of deterring police misconduct. 711 F.3d at 469. We of course agree with the *Fisher* court and acknowledge the value of deterring police misconduct in the interests of judicial integrity and public trust. However, vacating a guilty plea in a case that an officer was involved with based upon wholly unrelated conduct weighing solely on the officer's general credibility is simply too blunt a tool to use in support of this goal. Doing so would undermine the likewise important public interests in the finality of judgments and the integrity of guilty pleas that are in the interest of both the defendant and the State.

Petitioner also cites to *United States v. Seng Chen Yong*, 926 F.3d 582 (9th Cir. 2019). There, federal and state agents suspected that guests staying in several villas at Caesar's Palace in Las Vegas were running an illegal sports booking operation. *Seng Chen Yong*, 926 F.3d at 586. The agents worked with an IT contractor to disrupt internet service to several of the villas in order to surreptitiously search for evidence while posing as technicians. *Id.* at 586–87. After finding some evidence tending to confirm their

---

[13] Petitioner's reliance on *Sawyer v. United States*, 279 F. Supp. 3d 883 (D. Ariz. 2017), another affirmative misrepresentation case which cited heavily to *Fisher*, also fails for the same reasons.

suspicions, they filed a warrant application that was designed to give the impression that the internet disruptions had not been orchestrated by the agents. *Id.* at 587. The application also overstated what the contractor witnessed inside the villas. *Id.* During pretrial discovery, the defendants were provided a tape recording establishing that the agents had intentionally disrupted internet service to the villas. *Id.* Several of the defendants, including Seng Chen Yong ("Yong"), then filed motions to suppress the evidence gained from the searches. *Id.* Prior to the hearing on the motions, Yong agreed to plead guilty to a lesser offense in exchange for the government's dismissal of charges pending against his son stemming from the same gambling operation. *Id.* at 588.

Yong later challenged that plea on several grounds, including on the basis that the federal law enforcement agents' misconduct rendered it involuntary. *Id.* at 589. The Ninth Circuit disagreed and held that Yong's plea was voluntary because he was already aware of the misconduct that precipitated his arrest at the time of his plea. *Id.* at 594–95. Therefore, it could not be said that there was a reasonable probability that knowledge of the misconduct would have changed Yong's decision to plead guilty—the second prong under *Fisher* and *Ferrara*. *Id.*

Petitioner's reliance on *Seng Chen Yong* is misplaced. Although Petitioner correctly observes that here, unlike in *Seng Chen Yong*, Petitioner was not aware of the impeachment information until years after his pleas, the ultimate result is the same. There were actual misrepresentations in *Seng Chen Yong* that went to the core of Yong's case. That cannot be said for the case at bar.

22

Finally, Petitioner relies on *Bellamy v. State*, 403 Md. 308 (2008) in support of his argument that, by merely indicating that certain officers would testify at trial, the State was holding them out as providing truthful testimony that was entirely above reproach. *Bellamy*, however, merely dealt with the adoption by the State of one version of the facts of a murder during one defendant's plea hearing, and the proffer of a different version of those facts at a different defendant's trial. *Bellamy*, 403 Md. at 311–18. This Court held, based on the somewhat unique facts of the case, that the State's proffer from the plea hearing should have been admitted as an adoptive admission against the State at the trial of the second defendant. *Id.* at 319–30. The holding in *Bellamy* does nothing to suggest that in every case the State implicitly represents that any and all facts that it proffers at a guilty plea hearing are not only true to the best of its knowledge, but entirely unimpeachable—based not only on the testifying officer's conduct in that case but in all other prior and future cases.

In sum, the affirmative misrepresentation cases cited by Petitioner constitute a limited exception to the general rule that a guilty plea is valid if it is "entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel." *Brady v. United States*, 397 U.S. at 755 (citation omitted). Those cases involve instances of "egregiously impermissible conduct" consisting of affirmative misrepresentations that directly impacted the defendants' cases. *See Fisher*, 711 F.3d at 466 (finding that Fisher's "misapprehension stem[med] from an affirmative government misrepresentation that 'str[uck] at the integrity of the prosecution

23

as a whole'" and constituted "gross police misconduct") (citation omitted); *Seng Chen Yong*, 926 F.3d at 594 (finding Yong's plea to be voluntary notwithstanding that the district court found there to be "'gross police misconduct' that 'went to the heart of the prosecution's case'"); *Ferrara*, 456 F.3d at 291 (stating that the case involved a "sufficiently outrageous," "sufficiently parlous," and "particularly pernicious form of impermissible conduct" that raised due process concerns). Those circumstances are simply lacking here.

Moreover, none of the cases cited by Petitioner establish or even suggest that in proffering facts at a plea hearing the State is making an implicit representation regarding the credibility of its witnesses. And none of those cases establish that undisclosed evidence of police misconduct wholly unrelated to a defendant's case can be so critical to the defense that it renders the guilty plea involuntary. We decline Petitioner's request to make new law establishing either: (i) that by offering facts at a plea hearing the State is making a representation to the defendant as to the credibility of its witnesses, or (ii) that undisclosed police misconduct unrelated to a defendant's charges, without more, can render their guilty plea involuntary.

Apart from finding Petitioner's reliance on existing caselaw unavailing, we also independently assess the foundation for Petitioner's request for relief and find it to be both unrealistic and impractical. When Petitioner pled guilty, *Ruiz* had been the law for nearly a decade. By that point, an informed defendant surely should have known that there is no constitutional right to receive impeachment information prior to trial. Under *Ruiz*, waiving

24

the right to trial also entails the risk of waiving the right to that information, should it exist. Therefore, it strains credulity to say that by merely not providing a defendant with that information, which the State is under no obligation to provide, and by simultaneously fulfilling its obligation to proffer facts in support of a guilty plea under Maryland Rule 4-242(c), the State has made a misrepresentation to the defendant regarding the credibility of its witnesses.

It is also simply not possible for prosecutors to always make representations, affirmative or otherwise, regarding the general credibility of all of their witnesses prior to a defendant entering a guilty plea. As the Supreme Court has frequently had occasion to note, our criminal justice system is largely one of pleas rather than trials. *E.g.*, *Missouri v. Frye*, 566 U.S. 134, 143 (2012) (citing to Department of Justice sources indicating that 97 percent of federal convictions in 2009 and 94 percent of state convictions in 2006 were the result of guilty pleas). And those pleas are given at all different points in the process of criminal prosecution, sometimes before prosecutors are even involved. Entering into guilty plea agreements early on in the prosecution process is often beneficial to both the State and the defendant. An early resolution allows the State to forgo expending the necessary resources of preparing for trial, and often allows the defendant to receive a sentence that is shorter than the sentence they likely would receive if convicted after a trial. Those benefits would be undermined if the prosecution were required to determine the general credibility of all persons whom the State *might* anticipate calling at trial, and then disclose that information to the defendant prior to the defendant entering a guilty plea.

That Petitioner's pleas occurred on the date scheduled for trial does not exempt him from caselaw unequivocally holding that the government is not constitutionally obligated to provide impeachment evidence prior to the defendant entering a valid guilty plea. *See Ruiz*, 536 U.S. 622. That law should likewise stand for the proposition that the prosecution, in not providing that evidence, does not automatically make a misrepresentation to the defendant merely by proffering facts in support of its case. We decline to adopt an unworkable and impractical rule that would trigger an obligation on behalf of the State to make an affirmative representation to the defendant regarding the credibility of its witnesses at some point along the continuum of a prosecution still prior to trial.

## III.

### Conclusion

The Supreme Court in *Ruiz* held that the right to impeachment information under *Brady v. Maryland* is a trial right. That holding is not limited to instances where the impeachment evidence would be of only limited value to the defendant. Regardless of how important Petitioner perceives the misconduct of Officers Hersl and Wilson to be to his defense, he relinquished any right to that information he may have had when he waived his right to trial. We therefore hold that the State did not violate *Brady v. Maryland* by not disclosing that information. We also hold that the State did not make an implicit misrepresentation to Petitioner regarding the credibility of the witnesses it intended to call at trial. Therefore, the State also did not violate *Brady v. United States*. As none of Petitioner's constitutional or fundamental rights were violated, he cannot establish his

26

entitlement to coram nobis relief.  We therefore affirm, as did the Court of Special Appeals,

the circuit court's denial of Petitioner's request for coram nobis relief.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY THE PETITIONER.**